Marvelle **DORNHECKER,**
Plaintiff-Appellee,

v.

**MALIBU GRAND PRIX CORP.,**
Defendant-Appellant.

No. 87–1009

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Sept. 30, 1987.
Rehearing Denied Oct. 26, 1987.

Dan C. Dargene, El Paso, Tex., for defendant-appellant.

Susan Larsen, El Paso, Tex., for plaintiff-appellee.

Before GEE, GARWOOD, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The behavior of a co-worker at the Malibu Grand Prix Corporation proved too racy for Marvelle Dornhecker. She worked there in a corporate staff position for four days in December 1984 before resigning because of sexual harassment to which, she felt, the company was insensitive. This Title VII lawsuit followed, and the district court awarded her $25,000 compensatory damages. Malibu appeals.

We shall assume, without deciding, that Mrs. Dornhecker was the victim of unwelcome sexual harassment that was sufficiently pervasive to alter the conditions of her employment and create an abusive working environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986). The perpetrator was one Robert Rockefeller,[1] a contract consultant to the corporation in marketing, who was slated to attend a series of out-of-town presentations with Mrs. Dornhecker and other Malibu representatives during December 1984. Rockefeller's conduct in the presence of Mrs. Dornhecker was public, clownish and boorish. During two days of her first business trip with the company to Cincinnati and Miami, Rockefeller put his hands on her hips in an airport ticket line and dropped his pants in front of the passengers while waiting to board the airplane. He touched her breasts. Finally, when a number of Malibu employees attended a business dinner at the Downunder Restaurant in Fort Lauderdale, he put his stocking feet on a cocktail table directly in front of her and "playfully" choked her when she complained. The co-workers were appalled.[2]

The events most pertinent to this appeal commenced when Mrs. Dornhecker, overcome by Rockefeller's disgusting lack of professionalism, rushed to the ladies' room immediately after this last incident and dissolved, in her words, into hysterical tears. Her immediate supervisor, Krysia Swift, followed and tried to console her. Although Swift had not seen the choking incident, she agreed to talk to the company president about it. The next morning, December 6, Mrs. Dornhecker herself addressed Peabody, the president, and the court found that he "told Plaintiff that she would not have to work with Rockefeller after the Florida trip." The Florida presentations were then scheduled to last one-and-a-half more days. It is undisputed that Rockefeller did not attend the remaining presentations in Fort Lauderdale, and his contract with Malibu went un-renewed at the end of December. Mrs. Dornhecker was not present to savor these events: she believed management was unresponsive, and shortly after talking to Peabody on December 6, she left Fort Lauderdale, ex-

---

1. Despite the gilded surname, Rockefeller is unrelated to its wealthy holders and, at the time of trial, was in bankruptcy.

2. On more than one occasion during these two days, Rockefeller had used the expression "Let's get naked and go to my room." As Mrs. Dornhecker admitted, this offensive expression was not, however, necessarily directed at her.

plaining her departure only with a brief note in her supervisor's hotel mail slot.

■ The critical issue in this case for purposes of Title VII liability is whether Malibu, knowing about Mrs. Dornhecker's claims of sexual harassment, failed to take prompt remedial action.[3] The district court found that Malibu did not. This is clearly erroneous. Fed.Rule Civ.Proc. 52(a). Since the demise of the institution of dueling, society has seldom provided instantaneous redress for dishonorable conduct. In this case, the district court found that Malibu's president personally reassured Mrs. Dornhecker that Rockefeller would not be working with her after the Florida trip. This assurance occurred approximately 12 hours after Mrs. Dornhecker had tearfully confronted Krysia Swift in the ladies' room and first acquainted her with Rockefeller's behavior. Considered in terms of the speed with which the company addressed Mrs. Dornhecker's complaint or the length of time it proposed to resolve that complaint, Malibu's remedial action was unusually prompt.

■ Mrs. Dornhecker resigned before she ever saw or worked with Rockefeller again after dinner at the Downunder Restaurant. Thus, we do not know whether Rockefeller, ashamed by his performance or by conversation with Malibu employees, or by the prospect of being summarily booted out of the rest of the business trip, might have left Mrs. Dornhecker alone for the remaining one-and-a-half days in Florida. Where the offending conduct spanned only two days to begin with, it is not unreasonable for the company to offer ending it virtually overnight. And, although we do not condone Rockefeller's conduct, it was not as aggressive or coercive as that underlying a number of hostile sexual environment claims that have been unsuccessful in court.[4] Mrs. Dornhecker was not propositioned, she was not forced to respond to Rockefeller, she was not placed in any threatening situation. The company's remedy to Mrs. Dornhecker's complaint may be assessed proportionately to the seriousness of the offense. A company's lines of command, organizational format and immediate business demands cannot be wholly extracted from the analysis of its manner and promptness in resolving a claim of sexual harassment. The remedy was prompt.

Malibu's handling of the problem was also decisive. Ordinarily, an organization requires time to respond to embarrassing, emotional and often litigation-spawning claims of sexual harassment. Careers and corporate image rest on the company's handling of such charges. Here, Krysia Swift witnessed an hysterical outpouring from Mrs. Dornhecker, whom she had known and worked with for only two days, and whose reaction to offensive conduct Swift could hardly have been expected to assess in a moment. Whether Swift brushed off the charges or was just trying to defuse Mrs. Dornhecker's condition in the ladies' room is unclear but irrelevant. The next morning Peabody informed Mrs. Dornhecker that Rockefeller would only work with her one-and-a-half more days. Had Malibu believed it needed more time to consider Mrs. Dornhecker's complaints or what to do about them, it would have been reasonable. Rockefeller, despite his faults, had helped to purchase Malibu for its owners and held an employment contract. In this case, one cannot reasonably demand the employer to ignore its experience with the

**3.** *Jones v. Flagship International,* 793 F.2d 714, 719–20 (5th Cir.) *cert. denied,* —— U.S. ——; 107 S.Ct. 952, 93 L.Ed.2d 1001 (1986), establishes this Circuit's test for a hostile environment sex discrimination claim following *Meritor,* as follows: plaintiff must prove she (1) belongs to a protected group, (2) was subjected to unwelcome sexual harassment, (3) the harassment was based upon her sex, (4) the sexual harassment was so pervasive as to alter her conditions of employment and create an abusive working environment, and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action.

**4.** *See, e.g., Jones v. Flagship International,* supra (supervisor propositioned employee on three separate occasions while on business trips); *Rabidue v. Osceolo Refining Company,* 805 F.2d 611, 615 (6th Cir.1986); (prolonged exposure to sexually hostile employee who was habitually vulgar and displayed nude photos at work); *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210, 211 (7th Cir.1986) (plaintiff repeatedly propositioned).

alleged offender or to examine a charge of sexual harassment based on one side of the story, in a vacuum. Malibu speedily evaluated Mrs. Dornhecker's complaints.

◼ For these reasons, we find that the court clearly erred in its determination that Malibu did not promptly remedy Mrs. Dornhecker's predicament. A similar analysis leads to the conclusion that she was not constructively discharged. The district court asserted that Malibu's "inaction" upon Mrs. Dornhecker's complaints and her subsequent resignation effected a constructive discharge. Because Malibu's prompt response was the antithesis of "inaction", Mrs. Dornhecker was not constructively discharged. Moreover, constructive discharge occurs only "when the employer *deliberately* makes an employee's working conditions so intolerable that the employee is *forced* into an involuntary resignation.... [T]he issue is whether a *reasonable* person in the employee's position and circumstances would have felt compelled to resign." *Wilkins v. Univ. of Houston,* 654 F.2d 388, 390 (5th Cir.1981) (emphasis added) (quoting *Pittman v. Hattiesburg Municipal School District,* 644 F.2d 1071, 1077 (5th Cir.1981)). *See also Bourque v. Powell Electrical Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980) (rejecting constructive discharge claim based on discrimination). As the Eleventh Circuit recently put it, "[P]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." *Garner v. Wal-Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir.1987) (emphasis in original).[5] Under all the circumstances, Mrs. Dornhecker did not give Malibu a fair opportunity to demonstrate that it could curb Rockefeller's self-destructive exhibitionism.

The judgment of the district court is REVERSED.

---

**5.** *Garner,* supra, on this basis rejected the constructive discharge claim of a plaintiff who resigned one day after returning to work from a pregnancy leave because she was assigned to a position with less authority than she had before the leave.