**Albert BELL, Appellant,**

v.

**DYNAMITE FOODS, Respondent.**

No. 72236.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 2, 1998.

---

John D. Lynn, Denner & Lynn, L.L.C., St. Louis, for Appellant.

Robert J. Radice, Horas & Radice, L.L.C., St. Louis, for Respondent.

SIMON, Judge.

Albert Bell (Bell) appeals the trial court's grant of summary judgment in favor of Dynamite Foods, Inc. (Dynamite), his former employer, in an action brought by him for wrongful discharge. On appeal, Bell contends that the trial court erred when it: (1) suggested that an actual discharge is an element of the tort of wrongful discharge in violation of public policy; and (2) ruled that he cannot maintain a claim of constructive discharge because he did not give Dynamite a reasonable opportunity to work out his dispute with Dynamite before resigning in that he gave Dynamite ample opportunity. We affirm.

It is well-settled that when considering an appeal from summary judgment, we review the record in the light most favorable to the non-movant. *ITT Commercial Finance v. Mid–Am Marine,* 854 S.W.2d 371, 376[1–3] (Mo.banc 1993). Our review is essentially de novo. *Id.* at 376[4–6]. The criteria on appeal for testing the propriety of summary judgment are no different from those which are employed by the trial court to determine the propriety of sustaining the motion initially. *Id.* The burden on a summary judgment movant is to show a right to judgment flowing from facts about which there is no genuine dispute. *Id.* at 387[9].

A "defending" party may establish a right to judgment by showing: (1) facts that negate any one of the claimant's element facts; (2) that the non-movant has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) that there is no genuine dispute as to the existence of the facts necessary to support the movant's properly pleaded affirmative defense. *Id.* at 381[16].

The non-movant must show by affidavit, depositions, answer to interrogatories, or admissions on file, that one or more of the material facts shown by the movant to be above any genuine dispute is, in fact, genuinely disputed. *ITT* at 381[17]. A "genuine issue" exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts. *Id.* at 382[17]. A "genuine issue" is a dispute that is real, not merely argumentative, imaginary or frivolous. *Id.*

On May 3, 1996, Bell filed his second amended petition, alleging, in pertinent part, that:

4. [Bell] was initially employed by [Dynamite] in March, 1989 as a "floor man," responsible for cleaning, stripping and waxing the floors of [Dynamite's] facility.

\* \* \*

6. As of February 5, 1994, [Bell's] normal working hours were 8:00 p.m. to 6:00 a.m. [Bell] was typically alone in [Dynamite's] facility during his working hours.

7. On February 5, 1994, [Dynamite] informed [Bell] that henceforth all means of exit from [Dynamite's] facility, including the means by which [Bell] could reach the fire doors, would be locked during [Bell's] working hours. [Bell] was not provided with a key to the exits.

8. [Dynamite's] policy of locking all means of exit from its facility, including the means by which [Bell] could reach the fire doors, violated the Fire Code established by the ordinances of the City of St. Louis, Ordinance 61981, Section 1 (1990) ... and safety regulations promulgated by the Occupational Safety and Health Administration, 29 C.F.R. Section 1910.35–40.

9. On February 5, 1994, [Bell] protested the fact that all exits would be locked and threatened to report these conditions to the [F]ire [M]arshal.

10. In response to [Bell's] protests and threat to inform the [F]ire [M]arshal, Dy-

namite's owner, Marshall Stein, told [Bell] to leave the premises.

11. On February 7, 1994, [Bell] reported the conditions at [Dynamite's] facility to the [F]ire [M]arshal of the City of St. Louis and to the Occupational Safety and Health Administration.

12. After February 5, 1994, [Dynamite] refused to amend its policy of locking all means of exit and to allow [Bell] to return to work, and thus discharged Plaintiff.

13. [Dynamite] discharged [Bell] because he opposed [Dynamite's] policy of locking all means of exit from its facility, threatened to report the policy to public authorities, and did report it to public authorities.

* * *

We note that Bell's original petition is not in the record on appeal.

Subsequently, Dynamite filed its motion for summary judgment and memorandum in support, contending that there was no genuine issue of fact that Bell was an at-will employee, was not discharged by Dynamite but resigned, and the "public policy" exception to at-will employment could not be addressed since it had not discharged Bell.

In support of its motion, Dynamite filed several exhibits including: (1) an excerpt of Bell's deposition; (2) an excerpt of the deposition of Larry Morice (Morice), Bell's supervisor; (3) Bell's April 20, 1994 charge of discrimination with the Missouri Commission on Human Rights; (4) the Missouri Division of Employment Security's determination dated 3/07/94; and (5) an excerpt from Bell's response to Dynamite's supplemental interrogatories.

Dynamite addresses Bell's deposition, where he testified, in pertinent part, that: (1) no one from Dynamite told him that has was either fired or terminated and (2) he did not resign his position. In his deposition, Morice testified, in pertinent part, that: (1) he would be the normal person to hire or fire someone in Bell's position unless it was matter of a dishonest nature, such as stealing; (2) he did not fire Bell; and in fact, Bell quit; (3) other types of work could have been made available during the daytime shift on a short-term basis; (4) the work may have gotten down to only a four hour shift; and (5) it never got to the point of a potential permanent position because Bell quit.

Bell's charge of discrimination with the Missouri Commission on Human Rights provided, in pertinent part:

I. On February 6, 1994, I submitted my resignation . . .

* * *

III. I believe that I was constructively discharged due to my race in that . . .

c. Fearing for my safety and believing the situation would not change,

I felt that there was nothing I could do but to quit.

* * *

I declare under penalty of perjury that the foregoing is true and correct.

4–20–94 Albert Bell (signed)

The Missouri Division of Employment Security's determination provided, in pertinent part:

DETERMINATION:

THE CLAIMANT IS NOT DISQUALIFIED BECAUSE OF THE QUIT ON 02/05/94. THE CLAIMANT QUIT WITH GOOD CAUSE ATTRIBUTABLE TO HIS WORK OR EMPLOYER.

REASON:

THE CLAIMANT QUIT BECAUSE HE DID NOT WANT TO BE L[O]CKED IN THE BUILDING. THE FIRE DOOR WHICH HAD BEEN PREVIOUSLY OPENED WAS NOW LOCKED.

In pertinent part, Bell's response to Dynamite's supplemental interrogatories indicated that his employment with respondent was from "approximately April, 1989—February 6, 1994" and his reason for leaving employment was "constructive discharge."

Bell filed a response to Dynamite's motion for summary judgment, admitting that Bell was an at-will employee during his employment with Dynamite but contending that a jury could reasonably conclude that Bell was "constructively discharged" in contravention

of public policy in that Bell had no choice but resign his employment. In support, Bell filed excerpts from his deposition, which provided, in pertinent part:

Bell: ... Well, when I show[ed] up on February 5, Mr. Morice says, "Tonight they're going to start locking the doors, did they tell you?" I say, "Yes. Ken told me they was only going to just pull the gate; that they wasn't going to be padlocking it." And Mr. Morice says, "No, no. They're going to lock it. They're going to lock it in."

And I say, "Well, how am I going to be able to get out if there is a fire or something happens that I need to get out?' And Mr. Morice said, "You'll have to take that up with Marshal[l] and Ken." And I said, "Well, Mr. Morice, you're my boss, you know, can't you talk to them or ask them, you know."

At this time, this is when Mr. Stein, the owner, interrupts and walks over. He walks over and interrupts and he says, "You can use a crow bar and get out if you want to get out of here. You can break the lock." He said, "I give you my permission to break the lock with my crow bar." I asked him, "Well, why do I have to have a crow bar?" And he says, "Because. If I don't want to stay in the store with the doors locked, then I can leave," you know. I can get out of his place. And I was still trying to talk to Mr. Morice.

* * *

Q: When he said that, what did you do?
Bell: I asked Mr. Morice, I said, "Mr. Morice, I need my job. Isn't there something I can do?" He says, "You have to take it up with Marshal[l]." Marshal[l], you know, he's the boss, he owns the place. So I ask Mr. Morice, I said, "Well, can I come in in the morning." And he told me, ["]Well, yeah, you can come in in the morning. You can come in the morning, but you know you won't be able to continue to do it anyway because you won't have enough time every morning to clean the store. It takes ten hours a night to do it, so we'll have to find somebody to replace you. You can come in until we find somebody to replace you in the mornings."

* * *

Q: What did you mean by that? Could you come in in the morning?
Bell: In the morning when the produce people come in. They come in every morning around five o' clock or so—
Q: Okay.
Bell:— in the morning. And so Mr. Morice says, yeah, I could come in. I said, "Well, are you going to let Bob know tomorrow that I'm coming in"— who's the manager. And he said, "Bob." And I said, "Are you going to let him know." And he said yes.

* * *

Q: So I'm not— maybe I'm a little confused here. [Morice] told you you could show up at five o' clock the next morning?
Bell: Right.
Q: And was that something that was going to be, in your mind, a permanent situation or not?
Bell: No. He told me it was not going to be permanent; that it was only going to be temporary until he find[s] someone to replace me.
Q: So you understood him to be allowing you to work from five to nine to do the work that you would have done from eight to six on a temporary basis?
Bell: Right, to come in and get the store straight until we can work out something to where I wouldn't have to be locked in the store like that.
Q: And that's what he had indicated to you?
Bell: Right. Because I was trying to get him to talk to Marshal[l] and them to find— to try to work out something to where I wouldn't have to be locked in the store. And until then, I needed a job.

* * *

Additionally, Bell testified in his deposition, in pertinent part, that he: (1) told Morice, his supervisor, and Marshall Stein (Stein),

Dynamite's owner, when they first informed him of the padlocking that if they left him in the store with the doors padlocked, he would call the Fire Marshall as soon as they left; (2) waited in his car in Dynamite's parking lot beginning at 5:00 a.m., the morning of February 6th; (3) left at approximately 6:00 to 6:30 a.m. and went home because no one showed up; (4) returned to the store at 9:00 a.m. and gave Morice the keys to the scrub machine and janitorial closet, telling Morice that there was no way that he could clean the store in two hours and Morice responded "O.K."; (5) considered Dynamite had terminated him by not showing up at 5:00 a.m. and giving him another work schedule; (6) never heard any of Dynamite's representatives tell him he was fired; (7) returned two days later and asked Doug Brand (Brand), a Dynamite representative, "When can I have my job back? When can I start back to work? When can they— when would they stop padlocking the doors?;" (8) heard Brand respond that if Bell had talked to him before he had reported it to different people, they could have worked something out, but now Brand couldn't work anything out because he had too much stuff going on and [Stein] was too busy for Bell to talk to; (9) subsequently told Brand to either "give [him] his job back," and pay him for the two weeks he had been off work or Bell would file for unemployment; (10) heard Brand respond that he would get back to him; and (11) subsequently never heard from Brand again.

On January 23, 1997, the trial court issued its judgment, which provided, in pertinent part (citations omitted):

Dynamite argues that because [Bell] quit and that because Dynamite did not expressly terminate his employment, Bell's wrongful discharge claim, as a matter of law, fails. Bell contends that, although Dynamite never told him that he was fired, a jury question remains regarding Bell's constructive discharge.

* * *

Although constructive discharge has been used more frequently in federal labor cases, Missouri courts recognize the concept as well. Constructive discharge oc-

curs when an employer deliberately renders an employee's working conditions so intolerable that the employee is forced to quit their job. To effect a constructive discharge, the working conditions must be such that a reasonable person would find them intolerable. Evidence of a single instance is insufficient; "aggravating factors" or a continuous pattern of discriminatory treatment is needed to support the claim. Reasonableness requires an employee not to assume the worst, and not to jump to conclusions too fast. There is no constructive discharge where an employee quits without giving the employer a reasonable chance to work out a problem. The parties have not submitted, and the Court has not found, any Missouri cases addressing constructive discharge in the context of a common-law wrongful discharge claim.

The record indicates that Bell left his employment with Dynamite on February 6, 1994. On his discrimination claim with the Missouri Commission of Human Rights, Bell indicates that he submitted his resignation on that date. According to his deposition testimony, he also turned in his equipment keys to Morice that day, after he could not obtain access to the store earlier in the morning.

The gist of Bell's argument appears to be that a constructive discharge arose when Dynamite rendered it impossible for him to work on February 6, as a temporary arrangement until an alternative schedule or policy could be reached. On that occasion, he waited from 5 a.m. to 6:30 a.m. for someone to let him in the store. His next appearance at Dynamite was to turn in his keys. On the basis of one incident, consisting of an hour and a half wait for access to the store, Bell claims that his working conditions have been rendered so intolerable as to force him to quit hours later. Less than two days elapsed from the time Bell first learned of the closed-door policy to the time he turned in his keys to Morice. Dynamite did not have a reasonable chance to work out an alternative work arrangement with Bell. Bell's only contact with Morice after Feb-

ruary 6 was at his unemployment hearing. There is no evidence that Bell was intentionally denied access to work, only that no one was present to let him enter the store. The record is devoid of evidence from which a trier of fact could find this single incident to create an intolerable working condition so as to precipitate a constructive discharge.

Having found no discharge, actual or constructive, took place, the Court need not address the applicability of the public policy exception to the at-will employment doctrine to Bell's claim. However, the Court notes its skepticism that the narrow public policy exception to the employment-at-will doctrine can be extended to "constructive" discharges.

## ORDER AND JUDGMENT

For the foregoing reasons, it is

ORDERED, ADJUDGED and DECREED that [Dynamite's] Motion for Summary Judgment is granted, there being no genuine issue of material fact and [Dynamite] being entitled to judgment as a matter of law, and judgment is entered in favor of [Dynamite] and against [Bell] on the petition herein, which is dismissed with prejudice at [Bell's] cost.

In his first point, Bell contends that the trial court erred when it suggested that an actual discharge is an element of the tort of wrongful discharge in violation of public policy in that a constructive discharge is sufficient. The trial court's judgment provided "the parties have not submitted, and the Court has not found, any Missouri cases addressing constructive discharge in the context of a common-law wrongful discharge claim" and "the Court notes its skepticism that the narrow public policy exception to the employment-at-will doctrine can be extended to 'constructive' discharges."

The public policy exception to employment-at-will is a narrow one. *Lynch v. Blanke Baer & Bowey Krimko, Inc.*, 901 S.W.2d 147, 150 (Mo.App.1995). Our courts have outlined four categories of public-policy exceptions: (1) discharge of an employee because of his or her refusal to perform an illegal act; (2) discharge because an employee reported violations of law or public policy to superiors or public authorities; (3) discharge because an employee participated in acts that public policy would encourage, such as jury duty, seeking public office, asserting a right to collective bargaining, or joining a union; and (4) discharge because an employee filed a worker's compensation claim. *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 873–75 (Mo.App.1985).

Bell admits that he was an at-will employee while he was employed at Dynamite, and his cause of action is directed towards wrongful discharge because he reported violations of law or public policy to superiors or public authorities. To prevail on such a claim, Bell must prove that: (1) he reported to superiors or to public authorities serious misconduct that constitutes a violation of the law and of well-established and clearly mandated public policy; (2) Dynamite discharged him; and (3) there was an exclusive causal connection between his discharge and reporting violations to either his superiors or to public authorities. *Lynch*, 901 S.W.2d at 150.

In its motion for summary judgment, Dynamite negated the element of discharge in the public-policy exception, contending that there was no genuine issue of fact that Bell was an at-will employee and was not discharged but resigned.

In support of its motion, Dynamite filed several exhibits, including excerpts of Bell's and Morice's depositions; Bell's charge of discrimination with the Missouri Commission on Human Rights Civil Rights Enforcement; a Missouri Division of Employment Security determination; and an excerpt from Bell's response to Dynamite's supplemental interrogatories.

In his deposition, Bell's immediate supervisor, Morice, stated that he never told Bell he was fired and considered Bell quit due to his actions of February 6th. In his deposition, Bell stated that none of Dynamite's representatives ever informed him he was terminated but he had not "resigned." The documents from the Missouri Commission on Human Rights and the Missouri Division of Employment Security indicate that Bell re-

signed on February 6th. Additionally, it is undisputed that Bell turned in the keys to the scrub machine and janitorial closet at 9:00 a.m., February 6th. The record is clear that Bell resigned on February 6th, and the only report of the condition of the locked exits Bell made before this time was on February 5th to Morice and Stein.

In his response to Dynamite's motion for summary judgment, Bell did not dispute that he resigned but contended that "[he] had no choice but to resign his employment with [Dynamite]" and therefore, Dynamite constructively discharged him.

 Missouri courts have recognized the concept of "constructive discharge" in the context of unemployment compensation under Section 288.050 RSMo 1994 (all further references shall be to RSMo 1994 unless indicated otherwise), see Div. of Emp. Sec. v. Labor & Ind. Rel. C., 739 S.W.2d 747, 749 (Mo.App.1987); employment discrimination under Section 296.020, see Missouri Com'n on Human Rights v. City of Sikeston/Sikeston Power Plant/Bd. of Mun. Utilities, 769 S.W.2d 798, 805 (Mo.App.1989); and retaliatory discharge in workers' compensation law under Section 287.780, see Palermo v. Tension Envelope Corp., 959 S.W.2d 825, 828 (Mo.App.1997). An employer constructively discharges an employee when the employer " 'deliberately renders the employee's working conditions intolerable and thus forces [him] to quit [his] job.' " Id. (quoting West v. Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir.1995)). Whether or not an employee will be found to have been constructively discharged depends on whether " 'a reasonable person would find his working conditions intolerable.' " Id.

 While the concept of constructive discharge has only been previously addressed in relation to statutory claims, we conclude that constructive discharge should be recognized in common law actions for wrongful discharge claims based upon the common law public policy exception to employment-at-will.

In his second point, Bell contends that the trial court erred when it ruled that he cannot maintain a claim of constructive discharge because he did not give Dynamite a reason-able opportunity to work out his dispute with it before resigning in that he gave Dynamite ample opportunity to correct the situation.

The trial court's judgment primarily focused on Bell's actions in response to the condition of the locked exits: "[l]ess than two days elapsed from the time Bell first learned of the closed-door policy to the time he turned in his keys to Morice ... Dynamite did not have a reasonable chance to work out an alternative work arrangement with Bell."

While the parties have not directed us to nor has our research uncovered any Missouri cases that have addressed this aspect of constructive discharge, our examination of numerous federal cases involving constructive discharge indicate that an employee who quits without giving his employer a reasonable chance to work out a problem is not constructively discharged. West, 54 F.3d at 498. Our review of the cases indicate that typically, an employee who quits after an employer has had only one or two days to work out the problem is not constructively discharged. See i.e. Shealy v. Winston, 929 F.2d 1009, 1013 (4th Cir.1991)(retiring one or two days after being informed of demotion from chief magistrate to magistrate was not a constructive discharge where he was told some type of alternatives would be investigated); Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 310 (5th Cir.1987)(resigning less than a day after coworker's offensive behavior on a business trip was not a constructive discharge where management assured employee she would not have to work with coworker but would have to finish remaining day and a half of trip); West, 54 F.3d at 498 (resigning one week without investigation after management offers to take open sales territories was not a constructive discharge); Yearous v. Niobrara County Memorial Hosp. By and Through Bd. Of Trustees, 128 F.3d 1351, 1357 (10th Cir.1997)(resigning two days after hospital administrator returned from vacation and began investigation of director of nursing was not a constructive discharge); Garner v. Wal–Mart Stores, Inc., 807 F.2d 1536, 1540 (11th Cir.1987)(resigning one day after employee who returned from a pregnancy leave was

reassigned to the position of "floater" was not a constructive discharge).

Here, it was not reasonable for Bell to resign the next day after the policy of locking all exits was announced given the fact the circumstances present in this case. When the new policy was announced the night of February 5th, Morice agreed at that time that Bell could come in and work on February 6th, at 5 a.m., the time the produce people show up. No one showed up and Bell "considered Dynamite ... had terminated me by not showing up for the time that they gave me to come in." The record does not reflect why there were no representatives to let Bell into the store only that no one showed up. Bell returned to Dynamite at 9:00 a.m. and met with Morice. Bell did not ask Morice why no one showed up to let him in earlier in the morning and did not inquire about the status of the policy on the overnight shift and his status with the company. Instead, Bell handed Morice his keys and told him "there was no way that I could clean 100,000 square feet of grocery store, or even begin to clean it, and get it done by [9:00 a.m.] in the amount of time; that no one had even showed up around [6:00 a.m.], [6:30 a.m.]." Morice took Bell's keys and responded "O.K."and Bell left.

Bell contends "an employee is not required to remain on the job, and risk serious injury to himself, while he waits to see whether the employer will correct a hazardous work condition." Bell directs us to two cases involving constructive discharge where employees were faced with hazardous work conditions: *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 371–372 (5th Cir.1981); and *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423 (7th Cir. 1989). *Meyer* involved an employee who was transferred to work in a warehouse, where she would be required to engage in heavy lifting when she was over five months pregnant. The employee confronted her supervisor and told him that she could not do the work without harming herself or her unborn child and indicated that she did not think he would do that. He responded by snickering and in effect, told her that it did not bother him. She asked him to "go home and sleep on it tonight and see if you wake up with a clear conscience," He replied "I have," and the employee resigned. The Fifth Circuit upheld the trial court's finding that the employee had been constructively discharged.

*Brooms* involved an employee who was repeatedly subjected to grossly offensive conduct and commentary from her Human Resources manager over a sixteen month period. After working for the company for approximately nine months, the employee sent a letter in December, 1983, which was drafted with the assistance of the Illinois Department of Human Rights and outlined the manager's explicit racial and sexual remarks, to the company's vice president/general manager, vice president of human resources, and her immediate supervisor. An independent investigator was hired, the manager was confronted and subsequently apologized to the employee and the offensive conduct ceased. In February 1984, the manager's sexual and racial comments resumed, which included him showing her pornographic photographs. A month or so later she filed her first charge of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. On July 5, 1984, the offensive conduct culminated in an incident where her supervisor showed her an extremely offensive photograph, grabbed her arm when she attempted to seize a copy of it and threatened to kill her if she moved. The employee threw coffee on the manager and fled, never returning to work. The Seventh Circuit upheld the trial court's finding that the employee had been constructively discharged.

Here, unlike the situations present in *Meyer* and *Brooms,* Bell was not faced with working in a hazardous working condition but instead, was provided with the alternative of working temporarily the following day, with albeit reduced hours, in an environment that did not include the exits being locked. Thus, *Meyer* and *Brooms* are of no assistance.

Bell also contends that "to avoid liability for constructive discharge ... Dynamite was obligated to promptly offer Mr. Bell some legitimate option for continued employment, either by offering him a substantially equivalent job on the day shift or, at the very least,

letting him know that it would seriously consider making such an offer in the very near future." Given the time frame in which Bell turned in his keys to Morice, he essentially argues that Dynamite was under an obligation to immediately offer him an equivalent position or at least promise to do so upon learning of his dissatisfaction with the change in policy.

Our review of cases involving constructive discharge does not lead us to agree with Bell's contention. Bell left that night and was scheduled to work the next day, albeit for less hours. There is some dispute as to the conditions surrounding Bell's employment with Dynamite, however, it is undisputed that he was offered employment. In light of Bell's actions in quitting that morning when no one showed up after waiting an hour to an hour and a half, we cannot say that a constructive discharge occurred.

JUDGMENT AFFIRMED.

ROBERT G. DOWD, Jr., P.J. and HOFF, J., concur.