**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**October 21, 2005**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 04-31109
Summary Calendar

THOMAS KREAMER

Plaintiff - Appellant

v.

HENRY'S TOWING; TETRA APPLIED TECHNOLOGIES LP

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:03-CV-3139-N

Before KING, Chief Judge, and BARKSDALE and BENAVIDES, Circuit
Judges.

PER CURIAM:[*]

In this Title VII same-sex harassment action, plaintiff-appellant Thomas Kreamer appeals the district court's grant of summary judgment in favor of Tetra Applied Technologies, Kreamer's former employer. For the reasons stated below, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

# I. FACTUAL AND PROCEDURAL BACKGROUND

From December 2001 to May 2002, Thomas Kreamer worked for Tetra Applied Technologies ("Tetra") as a deckhand on a tugboat named the <u>Bacchus</u>. Each tugboat in Tetra's fleet had two-member crews consisting of a captain and a deckhand. The tugboats were assigned to various oil rigs located twenty miles from land, and their crews worked and slept on the boats in fourteen-day hitches. When disciplinary issues with Tetra employees arose, each captain had the authority to discipline his own boat's deckhand, but a captain could not discipline a deckhand from another boat. Tetra's tool pusher oversaw Tetra's operations on the rig itself and had the authority to recommend disciplinary measures. Tetra also employed a human resources manager, Sid Falgout, who handled staff disciplinary problems.

Kreamer alleges that during his employment with Tetra, Carroll Carrere, a deckhand from another Tetra boat assigned to the same Chevron-Texaco oil rig as the <u>Bacchus</u>, sexually harassed him over a six-day period in May 2002. Kreamer regarded Carrere as a "loud-mouth" type, known to engage in excessive horseplay, argue, and use foul language with his co-workers. Tetra, on the other hand, believed Carrere to be a competent employee who sometimes participated in an above-average level of roughhousing. Prior to May 2002, Falgout had never received a complaint that Carrere had behaved in a sexually offensive manner toward any of

his co-workers.[1]

Kreamer asserts that the alleged sexual harassment began on May 9, 2002, when Carrere approached Kreamer from the side and grabbed him between the legs.  Although no one was present to witness the incident, Kreamer reported the occurrence to the captain of the Bacchus, Darrell Naquin, who said that he would inform the rig's tool pusher and Carrere's captain, Wayne Lambas. Carrere allegedly grabbed Kreamer in a similar manner three more times on that day, at one point telling Kreamer that he "would like to compare packages."  Later that day, Naquin and Lambas sat down with Carrere and instructed him to stop annoying Kreamer. That night, Kreamer began documenting these incidents in a notebook where he continued to record similar interactions with Carrere that occurred over the next few days.

Kreamer alleges that Carrere continued his harassing behavior throughout that week, directing offensive gestures and whistles at him when they came into contact.  On May 10, Carrere allegedly approached Kreamer from the front and again grabbed him between the legs.  In response to Kreamer's complaint, Naquin again spoke with Lambas and asked him to instruct Carrere to stop bothering Kreamer.  Kreamer also alleges that on May 11, while he

---

[1] Tetra had previously received complaints regarding Carrere's excessive horseplay, although nothing in the record indicates that his behavior was sexual in nature.  In one instance, Carrere received a written warning for throwing eggs at a co-worker.  In another instance, a cook had complained that Carrere snuck up behind him and grabbed him on the sides.

was attempting to tie up the Bacchus to Carrere's boat at the end of his shift, Carrere twice threw the rope off the bit. Kreamer reported this incident to Naquin, who spoke with Carrere personally and again reported Carrere's behavior to Lambas. Next, on May 12, Carrere allegedly snuck up behind Kreamer and yet again grabbed him between the legs. Kreamer again reported the incident to Naquin, and Lambas once more warned Carrere to stay away from Kreamer and refrain from engaging in this type of conduct. On May 13, Carrere again disrupted Kreamer's attempt to tie up the boats. In response to Kreamer's protests, Carrere blew a kiss in Kreamer's direction. Kreamer also claims that one morning during the week in question, he awoke to find Carrere standing in his sleeping quarters, staring at him. Carrere did not say anything to Kreamer, did not touch him, and did not try to get into his bed. When Kreamer yelled at him to "get the hell out," Carrere left without speaking. Kreamer subsequently reported this incident to Naquin.

Despite Naquin's and Lambas's warnings to leave Kreamer alone, Carrere's behavior allegedly escalated on May 14. That morning, Carrere grabbed Kreamer once, and Kreamer told him to stop. Later that day, Carrere again threw the rope off the bit as Kreamer attempted to tie the boats together. Kreamer also alleges that, at the end of that night's shift, Carrere attempted to put a hot lighter between Kreamer's legs and then burned Kreamer's wrist with the lighter during a meeting in the galley

-4-

of the Bacchus.  Both Naquin and Lambas were present for the
incident, as was Del Deshotel, the Chevron-Texaco representative
on the rig.  Kreamer asserts that immediately after this
incident, he said to Deshotel, "This is the kind of shit I'm
tired of" and walked out of the galley.  Later that night,
Naquin, Lambas, and Deshotel each checked on Kreamer and assured
him that Carrere would be removed from the rig the next day.

By the next day, May 15, Naquin had spoken with Tetra's tool
pusher about Carrere's behavior, and Carrere had received orders
from Tetra's shore personnel to leave the rig and return to the
dock without completing his hitch.  That morning before he left,
Carrere approached Kreamer in the engine room of the Bacchus and
grabbed him from behind as Kreamer was bending over the engines.
According to Kreamer, Carrere then told him that he "would like
to f--- that piece of ass."  Kreamer reported this incident to
Naquin, who told him that Carrere was leaving that day.  After
Carrere left, Kreamer did not encounter him again throughout the
remainder of his hitch, although he claims that he was exposed to
taunting and embarrassing comments about Carrere from other crew
members.  Falgout, Tetra's human resources manager, formally
disciplined Carrere upon Carrere's return to shore.

Upon the completion of his hitch, Kreamer complained to
Falgout in person about Carrere.  Specifically, Kreamer contended
that Tetra should have fired Carrere for his conduct rather than
giving him a warning and transferring him mid-hitch.  Falgout

explained that he had already spoken with Carrere about his behavior.  Falgout also reviewed Kreamer's notes with him and suggested that he add more details to clarify what had occurred during each encounter with Carrere.  Neither Kreamer nor Falgout ever used the term "sexual harassment" while the incidents were occurring or afterward when they met to discuss Kreamer's complaints.  Likewise, Kreamer's notes do not explicitly reflect that Kreamer interpreted Carrere's conduct to have been sexual in nature.

Soon after his meeting with Falgout, Kreamer suffered an injury that prevented him from returning to work for Tetra until August 13, 2002.  On that day, Kreamer saw Carrere for the final time when Carrere's tugboat passed the Bacchus, and Carrere whistled at Kreamer.  The day after Kreamer returned to work on the Bacchus, Tetra sold its operations to Henry's Marine; thus, August 13 marked Kreamer's final day as a Tetra employee.

Kreamer filed a lawsuit in the United States District Court for the Eastern District of Louisiana, claiming that he was subjected to a hostile work environment based on sexual harassment in violation of Title VII of the Civil Rights Act of 1964.  The district court granted Tetra's motion for summary judgment, holding that Kreamer failed to prove (1) that the harassment was based on sex, and (2) that Tetra failed to take prompt remedial action.  Kreamer v. Henry's Marine, No. 03-3139 (E.D. La. Oct. 7, 2004).  This appeal followed.

## II. DISCUSSION

### A. Standard of Review

We review a grant of summary judgment de novo, applying the same standard that the district court applied. Chaplin v. NationsCredit Corp., 307 F.3d 368, 371 (5th Cir. 2002). Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment "bears the burden of identifying those portions of the record it believes demonstrate the absence of an issue of material fact." Lincoln Gen. Ins. Co. v. Reyna, 401 F.3d 347, 349 (5th Cir. 2005). The burden then shifts to the non-moving party to "show the existence of a genuine fact issue for trial." Id. We view the evidence and all reasonable inferences from the evidence in the light most favorable to the non-moving party. Id. at 350.

### B. Analysis

Title VII of the Civil Rights Act of 1964 prohibits workplace discrimination, including discrimination based on sex. 42 U.S.C. § 2000e-2(a)(1) (2000). To establish a prima facie case for a hostile work environment claim based on sexual harassment, a plaintiff must prove that: (1) he belongs to a class protected under the statute; (2) he was subject to unwelcome sexual harassment; (3) the harassment was based on sex;

(4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir. 1995); Jones v. Flagship Int'l, 793 F.2d 714, 719 (5th Cir. 1986). Based on our review of the undisputed factual record, we hold that Tetra took prompt remedial action as a matter of law and affirm the district court's grant of summary judgment.[2]

To constitute "prompt remedial action," an employer's response to a harassment complaint must be "reasonably calculated" to end the harassment. Skidmore v. Precision Printing & Packaging, 188 F.3d 606, 615 (5th Cir. 1999). To be reasonably calculated to end the harassment, an employer's actions need not end the harassment instantly. See Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309 (5th Cir. 1987) ("Since the demise of . . . dueling, society seldom has provided instantaneous redress for dishonorable conduct."); see also Indest v. Freeman Decorating, Inc., 164 F.3d 258, 262-63 (5th Cir. 1999) (holding that employer took prompt remedial action when it suspended harasser one month after the incident occurred). Likewise, an employer need not impose the most severe punishment to comply with Title VII. Landgraf v. USI Film

---

[2] Because we hold that Tetra took prompt remedial action as a matter of law, we need not address whether Carrere's conduct constituted harassment based on sex.

Prods., 968 F.2d 427, 430 (5th Cir. 1992); see also Skidmore, 188 F.3d at 615-16 (holding that the employer took prompt remedial action when it transferred the harasser to a different shift rather than firing him); Indest, 164 F.3d at 262-63 (holding that a one-month suspension constituted prompt remedial action). Instead, determining what is reasonably calculated to end the harassment is a highly contextual inquiry:

> What is appropriate remedial action will necessarily depend on the particular facts of the case--the severity and persistence of the harassment, and the effectiveness of any initial remedial steps. . . . [N]ot every response by an employer will be sufficient to discharge its legal duty.  Rather, the employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not "reasonably calculated" to halt the harassment.

Skidmore, 188 F.3d at 615-16 (quoting Waltman v. Int'l Paper Co., 875 F.2d 468, 479 (5th Cir. 1989)).  Accordingly, we assess the employer's remedy proportionately to the seriousness of the offense and in light of "the company's lines of command, organizational format[,] and immediate business demands." Dornhecker, 828 F.2d at 309.

In this case, Tetra's response was reasonably calculated to end the harassment given the duration and severity of the harassment.  The undisputed facts reflect that the harassment lasted a total of six days, and that Carrere never physically harassed Kreamer again after Tetra transferred Carrere on May

15.[3]  See Skidmore, 188 F.3d at 615-16 (holding that the employer took prompt remedial action when it admonished the harasser and transferred the plaintiff to a new shift, terminating the hostile work environment).  Because Kreamer and Carrere did not work on the same boat, they came into contact only sporadically over that six-day period; thus, the harassment was not continuous but rather a series of isolated incidents.  See Indest, 164 F.3d at 262-63 (holding that the employer's response was appropriate when it disciplined the harasser and separated him from the plaintiff after four reported incidents of harassment during a business trip).  Moreover, most of Carrere's behavior was bullying rather than sexual in nature, a fact reflected in Kreamer's own notes and contemporaneous accounts of the incidents to his superiors.  Even though Kreamer never specifically complained of sexual harassment, Tetra put an end to the behavior in less than a week.  See Carmon v. Lubrizol Corp., 17 F.3d 791, 794-95 (5th Cir. 1994) (holding that the employer took prompt remedial action when the

---

[3] The single whistling incident of August 13 is not sufficient proof that Tetra's actions were not reasonably calculated to end the harassment.  Tetra had taken action to separate Kreamer and Carrere, and the physical harassment did in fact stop altogether after May 15.  That Kreamer's and Carrere's tugboats, no longer assigned to the same oil rig, would have passed each other on the ocean at the same time three months later was merely a fortuitous occurrence that Tetra could not have prevented short of firing Carrere, which it was not legally obligated to do.  See Landgraf, 968 F.2d at 430 (noting that "Title VII does not require that an employer use the most serious sanction available to punish an offender").

employer disciplined the alleged harasser within three days of the plaintiff's initial complaint even though the employer's investigation revealed that horseplay, not sexual harassment, had occurred).

Likewise, Tetra's response was consistent with Title VII given the Tetra chain of command and the realities of conducting business on an oil rig twenty miles from land. See Waymire v. Harris County, 86 F.3d 424, 429 (5th Cir. 1996) (taking into account the employer's "lines of command and organizational format" in determining that a three-month investigation into a harassment claim was prompt remedial action). From the very first day that Kreamer complained, May 9, Tetra personnel took action to end the harassment. In response to Kreamer's complaints, Tetra's on-site supervisors (the tugboat captains and the rig's tool pusher) gave Carrere a series of warnings to leave Kreamer alone, consistent with Tetra's chain of command and disciplinary policy. On May 14, when it became apparent that these warnings were not effective, the on-site supervisors contacted Tetra's shore personnel, who transferred Carrere the next day even though Carrere was in the middle of a two-week hitch. Compare Dornhecker, 828 F.2d at 309 (holding that the employer took prompt remedial action when it assured the plaintiff, who was harassed on a business trip, that she would no longer have to work with the harasser after the business trip ended).

-11-

Kreamer has presented no evidence establishing any issue of material fact that contradicts the above findings.  His bald contentions that Tetra's response did not constitute prompt remedial action because the harassment did not end instantaneously and because Tetra chose to discipline and transfer Carrere rather than fire him are insufficient to survive summary judgment.  See id.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.