**Karen GAMBER, Appellant,**

v.

**MISSOURI DEPARTMENT OF HEALTH AND SENIOR SERVICES, Respondent.**

**No. WD 67170.**

Missouri Court of Appeals, Western District.

June 5, 2007.

Lynne J. Bratcher, Kansas City, MO, J. Kirk Rahm, Warrensburg, MO, Co-counsel, for Appellant.

Robert R. Harding, Jefferson City, MO, for Respondent.

Before VICTOR C. HOWARD, C.J., ROBERT G. ULRICH, and LISA WHITE HARDWICK, JJ.

ROBERT G. ULRICH, Judge.

Karen Gamber appeals the directed verdict in favor of the Missouri Department of Health and Senior Services (DHSS) on her claims of disability discrimination and constructive discharge. She presents three points on appeal, arguing that the directed verdict was error because "sufficient" material facts were disputed and because her supervisor was an agent of DHSS. All three points are denied, and the judgment of the trial court is affirmed.

## Facts

In the light most favorable to Karen Gamber, the plaintiff at trial, the facts are as follows. *Dunn v. Enter. Rent–A–Car Co.*, 170 S.W.3d 1, 3 (Mo.App. E.D.2005). Karen Gamber worked as a social worker for the Missouri Division of Aging in the Benton County office from June 1997 to December 1997. Pam Lowe was her supervisor during her employment with the Division of Aging. Employment with the Division of Aging involved working with the elderly.

In December 1997, Ms. Gamber began working for the Missouri Division of Family Services in the Pettis County office. This employment involved Ms. Gamber's working with families and children. After approximately seven years, Ms. Gamber desired to work with the elderly again as opposed to working with families and children.

In November 2002, while she still worked for the Division of Family Services, Ms. Lowe approached Ms. Gamber about Ms. Gamber's desire to become employed once again by the Missouri Department of Health and Senior Services (DHSS), formerly called the Division of Aging. Ms. Lowe initially indicated that Ms. Gamber could work for DHSS in the Pettis County office. The Pettis County offices for the Division of Family Services and DHSS were located in the same building in Pettis County. Ms. Gamber lived nineteen miles from the Pettis County office. Ms. Gamber was not hired to work in the DHSS Pettis County office, though, because of a hiring freeze affecting that position.

Upon being informed that the position in Pettis County was unavailable due to a

hiring freeze, Ms. Lowe informed Ms. Gamber that a position was available in the DHSS Hickory County office. Ms. Gamber lived 70 miles from this office, and she did not want to drive 140 miles each day commuting to work. Ms. Lowe urged Ms. Gamber to consider the Hickory County position, assuring Ms. Gamber that it was relatively easy to transfer and that she would be transferred to Pettis County within six months. The policy of DHSS is that employees are placed on probation for a year, which can be reduced to six months. Employees may not transfer to another office while on probation. Ms. Lowe further stated that she knew how to work around the rules. If there was any problem with a transfer, Ms. Lowe said that she could treat the situation as a rehire. Ms. Lowe told Ms. Gamber that she would be transferred to Pettis County by her six-month re-employment date. Ms. Gamber accepted the position with the Hickory County office in December 2002. Ms. Gamber would not have gone to work for DHSS if Ms. Lowe had not promised her a transfer to Pettis County. Ms. Lowe was Ms. Gamber's supervisor upon her reemployment by the Department of Health and Senior Services.

On March 5, 2003, Ms. Lowe emailed Ms. Gamber. The email stated that Kathie Moore, Ms. Lowe's supervisor, was advertising open positions in the region encompassing Pettis County. Ms. Lowe advised Ms. Gamber to express her interest in the open positions to Ms. Moore. Ms. Moore informed Ms. Gamber that she could not transfer at that time because she was still on probation. Another person was given that job. Ms. Lowe informed Ms. Gamber that another social worker in the Pettis County office would be retiring in the near future and, accordingly, another position would become available.

Ms. Gamber began feeling ill in February 2003. In April 2003, she was diagnosed with uterine cancer. On April 30, 2003, Ms. Gamber had a total hysterectomy, and her doctor instructed that she be off work until June 16, 2003.

On June 12, 2004, Ms. Gamber called Ms. Lowe and told her that she had been released to go back to work the next Monday, June 16, 2003. Ms. Lowe told Ms. Gamber not to come back on June 16 because she needed her to be at one-hundred percent, and Ms. Gamber should wait until July 1 to return to work.

While Ms. Gamber was recuperating, two positions opened in the Pettis County office. One was the position of a retiring social worker and the other was the frozen position originally offered to Ms. Gamber. The two persons hired to fill those positions began their employment on July 1, 2003.

When Ms. Gamber returned to work on July 1, 2003, she discovered that the two open positions had been filled. That same day, Ms. Lowe gave Ms. Gamber her six-month mid-point evaluation. In the evaluation, Ms. Lowe found that certain evaluation criteria were not met due to Ms. Gamber's two month absence while she was recuperating from her illness. James Cook, Ms. Lowe's supervisor, subsequently informed Ms. Lowe that he was concerned because Ms. Gamber's case record did not contain sufficient documentation of egregious acts committed by Ms. Gamber to warrant her mid-point evaluation being so negative.

During the same conversation in which she was given her evaluation, Ms. Gamber spoke to Ms. Lowe about being transferred to the Pettis County office and asked why she had not been given one of the two open positions in Pettis County. Ms. Lowe responded that Ms. Gamber would not be transferred because Ms.

Lowe feared that Ms. Gamber's cancer would recur, that Ms. Gamber might die, that Ms. Gamber might have to take off time to go to a physician, and that the Pettis County office was too busy for Ms. Gamber because Ms. Lowe needed employees at one-hundred percent in that office.

Ms. Gamber then began to speak with Ms. Lowe about her future with DHSS. As she looked at her evaluation, Ms. Gamber stated that it was not a good evaluation and asserted that it judged her unfairly. Ms. Lowe then asked Ms. Gamber what she was going to do. Ms. Gamber stated that she could not continue to drive 70 miles each way to work. She stated, "I guess I'll find another job." Ms. Lowe replied, "I think that would be best." Ms. Gamber tendered her resignation on July 31, 2003, to be effective August 15, 2003.

Ms. Gamber filed a charge of discrimination with the Missouri Commission on Human Rights alleging that DHSS engaged in discriminatory actions. The Missouri Commission on Human Rights issued her a right-to-sue letter, and she filed a petition against DHSS on April 5, 2004, alleging claims pursuant to the Missouri Human Rights Act (MHRA)[1] and the common law. The petition contained two Counts. Count I asserted a claim for violation of the MHRA based on perceived disability. Count II asserted a claim for retaliation in violation of the MHRA. The petition averred that Ms. Gamber was discriminated against because of her uterine cancer and was forced to terminate her employment.

Trial in this matter began on March 28, 2006. At the close of Ms. Gamber's evidence on March 29, 2006, the trial court granted DHSS's oral motion for directed verdict. Ms. Gamber filed a motion for new trial on April 26, 2006, which was denied on August 4, 2006. Judgment was entered for DHSS on August 3, 2006. Ms. Gamber's appeal followed.[2]

## Standard of Review

"In reviewing a trial court's judgment granting a motion for directed verdict, [reviewing authority] must determine whether the plaintiff made a submissible case, i.e., whether the plaintiff introduced substantial evidence at trial that tends to prove the essential facts for his or her recovery." *Dunn*, 170 S.W.3d at 3. Reviewing authority views "all the evidence in the light most favorable to the plaintiff, giving him or her the benefit of all reasonable inferences, and disregarding the defendant's evidence except to the extent that it aids the plaintiff's case." *Id.* " 'There is a presumption in favor of reversing a trial court's grant of a motion for directed verdict unless, upon consideration of the facts most favorable to the plaintiff, "those facts are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to a result." ' " *Id.* (quoting *Friend v. Holman*, 888 S.W.2d 369, 371 (Mo.App. W.D.1994)).

## Point I

In her first point on appeal, Ms. Gamber claims the trial court erred in granting DHSS's motion for directed verdict. She argues that "sufficient" material facts were in dispute showing that DHSS engaged in an adverse employment action against her. She asserts that DHSS's refusal to allow her to transfer to Pettis County due to her perceived disability of cancer constitutes an adverse employment action.

---

1. The Missouri Human Rights Act is set forth in section 213.010 *et seq.*, RSMo.

2. Ms. Gamber does not appeal the directed verdict as to her claim of retaliation.

██ Ms. Gamber asserted her discrimination claim under the MHRA and did not assert a claim under the Americans with Disabilities Act. Nonetheless, in deciding a case under the MHRA, courts are "guided by both Missouri law and any applicable federal employment discrimination decisions." *Medley v. Valentine Radford Commc'ns, Inc.*, 173 S.W.3d 315, 319 (Mo.App. W.D.2005). "Under the MHRA, it is unlawful for an employer to discriminate against or discharge any employee because of a disability." *Id.* Section 213.055,[3] states in relevant part:

1. It shall be an unlawful employment practice:

(1) For an employer, because of the race, color, religion, national origin, sex, ancestry, age or disability of any individual:

(a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability;

(b) To limit, segregate, or classify his employees or his employment applicants in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, national origin, sex, ancestry, age or disability[.]

Disability is defined as:

a physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job[.]

§ 213.010(4).

██ Ms. Gamber asserts that to establish a claim of disability discrimination, she must show that she: (1) is disabled within the meaning of the statutes; (2) is qualified to perform the essential functions of her job; and (3) suffered an adverse employment action because of her disability or perceived disability. These are the elements of an Americans with Disabilities Act prima facie discrimination case. *Medley*, 173 S.W.3d at 320. They are not, however, the Missouri prima facie case standard. *Id.* (rejecting an assertion that the three elements advocated by Ms. Gamber are the elements of a prima facie case for disability discrimination under the MHRA).

In order to establish a prima facie case for employment disability discrimination, employee must show: (1) she is a member of a protected class because she has a disability protected by the statute, (2) employer took an adverse action against the employee and (3) evidence from which to infer that employee's protected status was a factor in employer's adverse action.

*Cook v. Atoma Int'l. of Am., Inc.*, 930 S.W.2d 43, 46 (Mo.App. E.D.1996); *see also Medley*, 173 S.W.3d at 320–21.

There is also a three-step burden shifting analysis that must be followed for the plaintiff to win in a discrimination case. The plaintiff must establish her prima facie case first. . . . Once this burden is met, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its conduct. If the employer does this, the burden then shifts back to the employee/plaintiff to show that the reason is

---

**3.** All statutory citations are to **RSMo 2000** unless otherwise stated.

pretextual.... Because Missouri law provides the prima facie case, we do not look to federal law for the prima facie case.

*Medley,* 173 S.W.3d at 321 (citations omitted).

Ms. Gamber argues there were sufficient material facts in dispute demonstrating an adverse employment action. From this assertion, she concludes the directed verdict in DHSS's favor was improper. "In a jury-tried case, a motion for directed verdict challenges the sufficiency of the plaintiff's evidence to make a case." *Spry v. Dir. of Revenue, State of Mo.,* 144 S.W.3d 362, 366 (Mo.App. S.D.2004). "In order for a plaintiff to make a submissible case, each and every element essential to establish a defendant's liability must be supported by substantial evidence." *Wilkerson v. Williams,* 141 S.W.3d 530, 533 (Mo.App. S.D.2004). "In this regard, substantial evidence is competent evidence from which a trier of fact can reasonably decide the case." *Ray v. Wisdom,* 166 S.W.3d 592, 596 (Mo.App. E.D.2005). "A directed verdict is proper only if one or more of the elements of a cause of action are not supported by substantial evidence." *Id.*

Ms. Gamber does not state on appeal that she made a submissible case as to each and every element of her cause of action. She does not cite the record on appeal demonstrating evidence supporting each element was presented at trial. Instead, she seems to assert sufficient material facts were presented to demonstrate she suffered an adverse employment action. While this element is common to both an ADA discrimination claim and the MHRA claim actually asserted by Ms. Gamber, it is only one of three elements required for a prima facie case. Ms. Gamber provides no explanation for why she fails to address the other two elements.

Moreover, DHSS states in its brief that a submissible case was not made as to the requirement that the purported adverse employment action was the result of Ms. Gamber's claimed disability. As noted, Ms. Gamber did not address this element in her brief, and she did not address the contention that a submissible case was not made as to this element in her reply brief.

In order to demonstrate the directed verdict in DHSS's favor was error, Ms. Gamber must demonstrate she made a submissible case as to each element of her claim. *Wilkerson,* 141 S.W.3d at 533. She fails to do so. "An 'appellate court should not become the appellant's advocate by ferreting out facts, reconstructing points, and deciphering arguments.'" *Engeman v. Engeman,* 123 S.W.3d 227, 236 (Mo.App. W.D.2003)(quoting *Rasse v. City of Marshall,* 18 S.W.3d 486, 489 (Mo.App. W.D. 2000)). "This court should not and will not become an advocate for [Ms. Gamber] by looking for a reason to challenge the trial court's findings." *Thomas v. Lloyd,* 17 S.W.3d 177, 190 (Mo.App. S.D.2000). As Ms. Gamber has not demonstrated she made a submissible case as to each and every element of her MHRA claim that she was discriminated against in that she was denied a transfer due to a disability, the directed verdict in favor of DHSS has not been shown to be error.

The point is denied.

### Point II

In her second point on appeal, Ms. Gamber claims the trial court erred in granting DHSS's motion for directed verdict. She argues there were "sufficient" material facts in dispute that DHSS engaged in an adverse employment action against her by constructively discharging her. She asserts the constructive discharge was due to her perceived disability of cancer.

Ms. Gamber's point is susceptible to two interpretations. She could be arguing that the claimed constructive discharge was an adverse employment action within the purview of the MHRA. This interpretation is supported by the language of the point relied on asserted by Ms. Gamber. If so, the analysis set forth in Point I applies, and the point is denied as Ms. Gamber fails to demonstrate she made a submissible case as to each element of an MHRA claim.

 The argument section of Ms. Gamber's second point could also be construed as an assertion that she was constructively discharged and, while her cancer was the motive for the constructive discharge, the claim is for common law constructive discharge as opposed to a claim under the MHRA. Ms. Gamber sets forth the elements of constructive discharge and argues that they were supported by sufficient evidence. "Issues not encompassed by the point relied on and raised only in the argument portion of the brief are not preserved for review." *Cordes v. Williams*, 201 S.W.3d 122, 129 (Mo.App. W.D.2006)(internal quote marks and citation omitted). Nevertheless, because this argument is set forth in the brief and this court would not have to become an advocate for a party in order to discuss the issue raised, this second interpretation will be addressed *ex gratia.*

 "Constructive discharge occurs when an employer deliberately renders an employee's working conditions so intolerable that the employee is forced to quit their job." *Bell v. Dynamite Foods,* 969 S.W.2d 847, 851 (Mo.App. E.D.1998). "To effect a constructive discharge, the working conditions must be such that a reasonable person would find them intolerable." *Id.* "Evidence of a single instance is insufficient; 'aggravating factors' or a continuous pattern of discriminatory treatment is

needed to support the claim." *Id.* "Reasonableness requires an employee not to assume the worst, and not to jump to conclusions too fast." *Id.* "There is no constructive discharge where an employee quits without giving the employer a reasonable chance to work out a problem." *Id.*

Ms. Gamber states the elements of constructive discharge are: (1) a reasonable person in the employee's situation would find the working conditions intolerable and (2) the employer intended to force the employee to quit, or the employer could reasonably foresee that its actions would cause the employee to quit. *Wright v. Rolette County,* 417 F.3d 879, 886 (8th Cir.2005). In *Missouri Commission on Human Rights v. City of Sikeston/Sikeston Power Plant/Board of Municipal Utilities,* 769 S.W.2d 798, 805 (Mo.App. S.D.1989), the Southern District stated this test, utilized by the Eight and Tenth Circuits. It also recognized that the Fifth Circuit does not require the second element. *Id.* It declined to address the conflict, though. *Id.* at 805–06. Other Missouri cases appear to utilize the test asserted by the Eighth and Tenth Circuits. *See Pollock v. Wetterau Food Distribution Group,* 11 S.W.3d 754, 764 (Mo. App. E.D.1999); *Bell,* 969 S.W.2d at 853; *Palermo v. Tension Envelope Corp.,* 959 S.W.2d 825, 828 (Mo.App. E.D.1997); *Mo. Div. of Employment Sec. v. Labor & Indus. Relations Comm'n,* 739 S.W.2d 747, 749 (Mo.App.W.D.1987). This court need only make this observation as Ms. Gamber failed to present sufficient evidence demonstrating the first element, that a reasonable person in her situation would find the working conditions intolerable.

 Ms. Gamber asserts her working conditions were intolerable for the following reasons. She was induced to take the job with DHSS by Ms. Lowe who prom-

ised her a transfer. She was required to drive an extra 102 miles a day[4] and commute for three hours per day. Ms. Lowe informed Ms. Gamber that she would not be able to transfer, both presently and by implication in the future, because of she had cancer. She states: "A reasonable person could find driving two additional hours to work, after being induced to take the job with the promise of a transfer that would eliminate the drive, to be intolerable."

Ms. Gamber claims she was constructively discharged because she was informed by Ms. Lowe that she would not be transferred to Pettis County presently or at any time in the future. According to her, the loss of the promised transfer rendered her working conditions intolerable. No aspect of her employment in Hickory County changed. Instead, her being informed that she would remain in Hickory County, with the exact same working conditions that had existed from the commencement of her employment, rendered the conditions intolerable.

Ms. Gamber essentially has two claims. First, she was constructively discharged when the two open positions in Pettis County were filled by other employees, thus precluding her from obtaining one of those positions as promised. Second, Ms. Lowe informed her she would not be transferred to Pettis County in the future. Ms. Gamber's testimony was that: (1) she knew she could not transfer while on probation; (2) she was told her probation period would be shortened to six months; and (3) accordingly, she was informed she

would be transferred to Pettis County after six months of employment in Hickory County. Assuming this is true, Ms. Gamber failed to present a submissible case.

Ms. Gamber testified she was offered the position in Hickory County "around December" of 2002. She stated she was "hired" on December 23, 2002. Ms. Gamber claims Ms. Lowe informed her she would not be transferred to Pettis County on July 1, 2003. Ms. Gamber does not direct this court to a page in the record indicating when Ms. Gamber actually began her employment with DHSS.[5] Ms. Gamber testified that she had been employed by DHSS for six months and a few days as of July 1, 2003. She presented no evidence that she had been taken off probation as of July 1, 2003, however. Moreover, the evidence was that the two employees hired in Pettis County began working on July 1, 2003. Ms. Gamber does not direct this court to a page in the record indicating when they were hired by DHSS. They were presumably hired some time before they arrived for their first day of work. Thus, Ms. Gamber failed to present evidence that her period of probation was over at the time these two jobs were filled by other employees. She did not make a submissible case as to her claim that being denied the two open positions in Pettis County rendered her working conditions in Hickory County intolerable.

Ms. Gamber also failed to present a submissible case as to her second claim, that being informed she would not ever be

4. Ms. Gamber lived 70 miles from the Hickory County office and 19 miles from the Pettis County office. She drove 102 additional miles each day in travelling to the Hickory County office compared to the Pettis County office.

5. There is some confusion with the years these events occurred. Ms. Gamber indicates she was offered the position with DHSS in December 2003. She further states she became ill, was diagnosed, and was constructively discharged in 2004. The record reveals she was offered the position in 2002 and the subsequent events occurred in 2003.

transferred to Pettis County rendered her working conditions intolerable. Ms. Gamber does not contend that she was explicitly told she could not transfer to Pettis County in the future. Instead, she asserts in her brief that she was implicitly told this when she was told she could not transfer as of July 1, 2003.

Ms. Gamber testified that in March 2003 a position became available in Pettis County. Ms. Lowe instructed her to contact Ms. Moore about transferring and filling that position. Ms. Moore then reiterated the policy that Ms. Gamber was ineligible to transfer while on probation. Ms. Gamber failed to present any evidence that Ms. Lowe had the authority to hire, fire, or transfer employees. Evidence was presented that Ms. Lowe had supervisors who made the hiring decisions and that Ms. Lowe simply made hiring recommendations.

Ms. Gamber's testimony was that Ms. Lowe informed her on July 1, 2003, that she would never be able to transfer, and, in that same conversation, Ms. Gamber stated she would have to resign. She formally submitted her resignation on July 31, 2003, the same day she was offered employment by a company. She ultimately accepted a position with that company. Ms. Gamber's resignation was to be effective August 15, 2003.

Ms. Gamber fails to direct this court to any evidence that she spoke with Ms. Moore or any other person besides Ms. Lowe about the possibility of her transferring to Pettis County in the future. In both her brief and reply brief she states that DHSS "had at least six weeks to correct the situation." She also states that she "gave her employer ample chances to work out the problem before quitting." She fails, however, to direct this court to any portion of the record indicating that she contacted a person other than Ms.

Lowe about transferring to Pettis County. "Reasonableness requires an employee not to assume the worst, and not to jump to conclusions too fast." *Bell,* 969 S.W.2d at 851. Even in the light most favorable to Ms. Gamber, the evidence does not establish that Ms. Lowe's implicitly informing Ms. Gamber that she would be unable to transfer to Pettis County in the future rendered her working conditions in Hickory County intolerable.

The point is denied.

## Point III

In her third point on appeal, Ms. Gamber claims the trial court erred in granting DHSS's motion for directed verdict. She argues Ms. Lowe was DHSS's agent and was acting on behalf of DHSS when she denied Ms. Gamber's request for a transfer. She states the trial court "seemed" to determine that Ms. Lowe's actions were not the actions of DHSS. Assuming Ms. Gamber's assertion is correct, and Ms. Lowe was an agent of DHSS, this point is without merit given the disposition of Points I and II.

The point is denied.

## Conclusion

Ms. Gamber has failed to demonstrate on appeal that she made a submissible case as to each element of her claims. Thus, the directed verdict was not error. Her points are denied, and the judgment of the trial court is affirmed.

All concur.