# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2402

_____

Chavonya Watson

*Plaintiff - Appellant*

v.

Heartland Health Laboratories, Inc.

*Defendant - Appellee*

Michelle Gaunt

*Defendant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: February 10, 2015
Filed: June 25, 2015

_____

Before LOKEN, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Chavonya Watson appeals the district court's[1] grant of summary judgment in favor of her former employer, Heartland Health Laboratories, Inc. ("Heartland"), on her claims of hostile work environment, constructive discharge, and retaliation under the Missouri Human Rights Act (MHRA). We affirm.

## I. *Background*

Heartland provides laboratory services, including blood work, to facilities that provide long-term healthcare. Watson, an African-American woman, began working for Heartland as a route phlebotomist on June 18, 2012. As a route phlebotomist, Watson's workday included traveling to several facilities, drawing blood and collecting urine or stool samples from those facilities' patients, and returning to the Heartland lab for a few hours to process the samples that had been collected that day. As a new employee, Watson was subject to a 90-day probationary period.

Watson's route included Plaza Manor Nursing and Rehabilitation Center ("Plaza Manor"). According to her testimony, Watson spent "[a] couple hours" at this facility each day. Watson worked on both the second and the third floors at Plaza Manor. Watson was assigned to draw blood from Charles Ramsey, a third-floor patient.

On September 10, 2012, Ramsey physically accosted Watson. While Watson was attempting to draw Ramsey's blood, he began touching Watson on the inside of her thigh and moved his hand upward. Watson told Ramsey to stop and brushed his hand away several times. When Ramsey touched her "crotch area," Watson took a different strategy and knelt down to draw Ramsey's blood. At this point, Ramsey "started putting his hand up the side of [Watson] because [her] crotch was no longer in his reach." After she stopped attempting to draw his blood because of the continued

---

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

touching, Ramsey "grabbed the back of [Watson's] neck to try to kiss [her]." Watson left Ramsey's room and reported the incident to her employer.

Watson called her phlebotomist team lead, Michelle Gaunt. Gaunt testified that she relayed the information to the phlebotomy supervisor, Tina Akers. Watson testified that she was able to finish the rest of her workday. By 12:24 p.m. that same day, Gaunt entered an alert in Heartland's file on Ramsey stating "[s]end male only to draw." Watson conceded that "Heartland . . . took prompt action to make sure [she] never provided medical services for . . . Ramsey after [she] made the complaint." Further, the record reflects that Heartland's Sales Manager, David Clay, contacted Plaza Manor's Assistant Director of Nursing, Wayne Herring, to address the incident that same day, to which Herring communicated "that he would take care of the situation." Upon returning to the lab at the end of her workday, Watson testified that she asked Gaunt and another team lead, Trisha Davis, if she "could possibly . . . transfer [Plaza Manor] or trade [Plaza Manor]" so that it would no longer be a part of her daily route. Watson testified that both team leads responded affirmatively. Watson testified that when she requested a route change from Akers, however, Akers told her "no, that [Watson] was hired to do that route and if [she] didn't do that route then [she] wouldn't have a job." Watson continued to go to Plaza Manor as a part of her route.

Watson no longer had to provide services to Ramsey and risk further physical contact while working at Plaza Manor; however, Ramsey still managed to verbally assault Watson on several occasions. On September 11, 2012, while Watson was walking past Ramsey in a hallway, Ramsey called her "just a bunch of b[*****]s and n[****]r b[*****]s." According to Watson, this contact lasted only "[s]econds." Watson testified that she reported this incident to Gaunt when she returned to the lab later that day.

The second incident happened a few days later when Ramsey saw Watson leaving the elevator. Ramsey declared "that they were going to put him out." Watson also confirmed that this incident lasted "[j]ust a couple of seconds." Watson understood Ramsey's statement to mean that Plaza Manor was going to remove Ramsey from the facility, but she was never notified specifically when this would happen. The third incident was similar to the second. When Watson was leaving the elevator, Ramsey was again walking by and said to another patient that "[t]his b[***]h is getting me put out." Watson notified Akers of Ramsey's continued verbal abuses, to which Aker's allegedly responded that "it comes with the territory."

The fourth incident happened sometime later when Ramsey was "hanging out of his door and he saw [Watson] and he came down to the nurses station and just stood there and stared at [Watson] the whole time [she] was there." Watson admitted that this incident was "offputting," but that Ramsey did not "harass [her] sexually" or "harass [her] racially in any way."

The fifth incident happened when Watson was walking past Ramsey's room and "he called [her] a b[***]h." A nurse standing nearby heard the comment and immediately confronted Ramsey.

The sixth incident happened when Watson was assigned to draw the blood of Ramsey's roommate. When Watson got the assignment and went to the patient's room, she did not realize that the patient was Ramsey's new roommate. Upon arriving at Ramsey's room, Ramsey promptly asked her "what the f[**]k are you doing over here[?]" Watson confirmed that this incident only "lasted a couple of seconds." Watson called Gaunt, who told Watson that she would have another person draw Ramsey's roommate's blood. Watson testified that when she returned to the lab later that day, however, Gaunt told her that she should have drawn the roommate's blood and that Gaunt said she was going to write Watson up for failing to do so. Watson

-4-

never saw this write-up, nor was she asked to sign the write-up. Heartland's policy for disciplinary procedures requires employees to sign write-ups.

The seventh and last incident happened on Friday, September 21, 2013. Watson was waiting for an elevator when Ramsey walked past her and said "[t]hey're putting me out, bitch. I'm going to get you." Watson confirmed that this incident "lasted less than a minute" because Ramsey "kept walking as he was saying it."

The next Monday, September 24, 2012, Watson sent a text message to someone at Heartland saying that she had a flat tire. Watson did not come into work that day or the succeeding two days. Coincidentally, September 24 was the same day that Ramsey was removed from Plaza Manor. Watson testified that "there was nobody else [at Plaza Manor] I had a problem with but just [Ramsey]." Watson even confirmed that "if [she] had gone to work that day, [her] problem would have been alleviated[.]" Under Heartland's employment policy, an employee is considered to have voluntarily abandoned his or her job after two consecutive days of absence without properly notifying Heartland. Thus, by September 26, Heartland considered Watson to have abandoned her job. On September 24–26, Heartland called Watson and left multiple voicemail messages for her. Watson admitted that she "stopped answering [her] phone for [Heartland], [even though] they were leaving [her] messages but [she] was deleting them. [She] didn't even listen to them." Watson returned to Heartland's lab on September 27, 2012, to return their equipment. Heartland's position has always been that if not for her voluntary abandonment, Watson would still have a job at Heartland.

During her short employment at Heartland, Watson received several disciplinary write-ups. She received a write-up on August 14 and a verbal warning on August 16, 2012, both of which she considered legitimate. Contemporaneous with Ramsey's offensive conduct, Watson also received two disciplinary warnings. On September 13, 2012, she received a verbal warning for an incident unrelated to

Ramsey. Watson agreed that the verbal warning was legitimate and that the document recording the incident accurately described what actually happened. On September 18, 2012, Watson received another warning for an incident that happened while she was working away from Plaza Manor. Watson contests the legitimacy of this warning, which was for her alleged failure to draw blood from a patient who refused to permit it. Based on these warnings, Watson suffered no adverse consequences, was not "docked," was never "told not to report to work," and her "job assignments [were not] changed in any manner."

Also on September 18, 2012, Watson was notified that Heartland was extending her 90-day probationary period. Watson confirmed that Heartland "believe[d] that [her] missing so much work interfered with [her] consistency" and that she "needed to have 30 days without an absence" because she "hadn't gone 30 days without an absence up to [that] point." Further, Watson admitted that she "didn't have a problem with extending the period" because she "needed more time . . . to be consistent and things like that."

Watson filed the instant lawsuit alleging violations of the MHRA. Watson alleged that Ramsey's actions constituted sexual and racial harassment that created a hostile work environment, that Heartland constructively discharged her, and that Heartland retaliated against her when she reported Ramsey's harassment. The district court granted Heartland summary judgment on all of Watson's claims. First, the district court found that Ramsey's actions were not enough to affect a term, condition, or privilege of Watson's employment to constitute a hostile work environment. Further, the court found that Heartland's prompt action effectively addressed the instances of harassment that it knew about. Second, the district court found that Watson was not constructively discharged because her working conditions were not so intolerable that she was forced to quit. Third, the court found that Heartland did not retaliate against Watson because Watson was not constructively discharged and

-6-

the disciplinary write-ups and extension of her probation period were not adverse employment actions.

## II. *Discussion*

On appeal, Watson argues the district court erred granting Heartland summary judgment for several reasons. First, she argues that there are genuine disputes of material fact for her hostile work-environment claim to survive summary judgment. Second, she argues that Heartland is not entitled to summary judgment regarding her constructive-discharge claim. Finally, she argues that Heartland is not entitled to summary judgment regarding her retaliation claim because she suffered adverse employment actions.

### A. *Hostile Work Environment*

Watson first argues that there are genuine disputes of material fact sufficient to survive summary judgment on her claim that Heartland created a hostile work environment by failing to adequately mitigate Ramsey's sexual and racial harassment. We review the district court's grant of summary judgment de novo. *LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 629 (8th Cir. 2005) (citing Fed. R. Civ. P. 56(c); *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

"In deciding a case under the MHRA, appellate courts are guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law." *Daugherty v. City of Md. Heights*, 231 S.W.3d 814, 818 (Mo. 2007) (en banc) (citation omitted). The MHRA prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, national

origin, sex, ancestry, age or disability[.]" Mo. Rev. Stat. § 213.055.1(1)(a). In order to survive summary judgment and take her case to a jury, Watson must show that "(1) she . . . is a member of a protected group; (2) she was subjected to unwelcome sexual harassment; (3) her gender was a contributing factor in the harassment; . . . (4) a term, condition or privilege of her employment was affected by the harassment"; and (5) "the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 666, 666 n.6 (Mo. 2009) (en banc) (citation omitted). We assume for the sake of analysis that an employer can be liable under the MHRA for harassment by a third party who is not an employee if these elements are satisfied. See *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422–23 & n.4 (4th Cir. 2014). The district court found that Watson could not prove the fourth element—that the alleged harassment affected a term, condition, or privilege of her employment.

The standard for proving the fourth element is demanding. "'Sexual harassment creates a hostile work environment when sexual conduct either creates an intimidating, hostile, or offensive work environment or has the purpose or effect of unreasonably interfering with an individual's work performance.'" *Lynn v. TNT Logistics N. Am. Inc.*, 275 S.W.3d 304, 308 (Mo. Ct. App. 2008) (quoting *Barekman v. City of Republic*, 232 S.W.3d 675, 679 (Mo. Ct. App. 2007)). This requires the harassment alleged to be "'so intimidating, offensive, or hostile that it poisoned the work environment,'" *LeGrand*, 394 F.3d at 1101 (quoting *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003)), and that the "workplace was 'permeated with discriminatory intimidation, ridicule, and insult.'" *Id.* at 1101–02 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Further, Watson must prove this demanding standard "both as it was subjectively viewed by [her] and as it would be objectively viewed by a reasonable person." *Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238, 245 (Mo. Ct. App. 2006) (citing *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998)). When

considering the objective hostility of a work environment, we consider "the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1076 (8th Cir. 2005) (citation omitted).

The question before this court, thus, is whether Ramsey's conduct over the period of ten working days[2]—including a sexual touching, a single racial slur, four sexually degrading slurs, and a threat[3]—raise a genuine dispute of material fact to survive summary judgment. In particular, the court must examine whether a reasonable person would consider Ramsey's conduct toward Watson to change a term, condition, or privilege of Watson's employment thus poisoning the work environment and permeating the environment with intimidation, ridicule, and insult.

The frequency of Ramsey's conduct was moderate but its duration was brief. Watson testified to a total of eight instances of physical and nonphysical conduct by

---

[2]September 10, 2012—the date the alleged harassment began—was a Monday. September 21, 2012—the last date that Watson was subjected to the alleged harassment—was the Friday of the following week.

[3]This list does not include several of Ramsey's alleged actions because of a lack of sexual or racial animus. When Ramsey was in the door of his room and stared at Watson for a prolonged period of time, there was no sexual or racial component to his action. Similarly, such a component is lacking when Ramsey told Watson the first time "that they were going to put him out." Also, Ramsey's comments to Watson when she unwittingly entered his room to draw blood from his roommate also lack a sexual or racial component. Therefore, these actions cannot be said to constitute sexual or racial harassment because we cannot determine, as a matter of law, that Watson's membership in a protected class was a "contributing factor in the harassment." *Hill*, 277 S.W.3d at 666. We will take these incidents into account, however, when assessing the "totality of the circumstances" of the work environment.

Ramsey over a period of ten working days. Offensive comments, under Missouri law, have been found sufficient to show a hostile work environment. *See Lynn*, 275 S.W.3d at 307–08. Watson's case, however, differs. Watson only worked at Plaza Manor for a couple of hours a day. Thus, she was not subject to Ramsey's conduct throughout her workday as in other Missouri and federal cases finding a hostile working environment existed. *See, e.g.*, *Ross v. Douglas Cnty., Neb.*, 234 F.3d 391, 393 (8th Cir. 2000); *Lynn*, 275 S.W.3d at 307 (Mo. Ct. App. 2008). Watson also acknowledges that her interactions with Ramsey lasted mere seconds. Given the short duration of Ramsey's actions, we conclude that an objective person would not find that Ramsey's conduct was sufficiently pervasive to poison Watson's work environment or permeate it with intimidation, ridicule, and insult. Ramsey's physical touching of Watson was highly offensive, but applying controlling precedent, his act does not establish a hostile work environment attributable to Heartland. *See, LeGrand*, 394 F.3d at 1100, 1102.

Regarding the verbal harassment, Watson relies on *Ross v. Douglas County, Nebraska* to support her contention that being called a highly offensive racial slur is enough to constitute a hostile work environment. 234 F.3d 391. In *Ross*, we found there was sufficient evidence to constitute a hostile work environment because the African-American victim was called a "n[****]r" and "black boy" for what appeared to be several years from 1995–97 with further "evidence at trial that [the harasser] constantly referred to [the victim] by a racial epithet." 234 F.3d at 396, 397. This case differs markedly from *Ross*, and Ramsey's single racial insult does not amount to the "stream of racial slurs" in other cases where we have found a hostile work environment. *Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 356–57 (8th Cir. 1997).

Watson also relies on the First Circuit case of *Forrest v. Brinker International Payroll Co., LP* to support her argument that being called sexually degrading slurs "has been consistently held to constitute harassment based upon sex." 511 F.3d 225,

229 (1st Cir. 2007) (citations omitted). *Forrest* involved a coworker "barrag[ing]" the victim at work with "sexually degrading, gender-specific epithets, such as 'slut,' 'cunt,' 'whore,' and 'b[\*\*\*]h.'" *Id. Forrest* is not controlling precedent, but even if it were, the instant facts are not comparable.

Viewing Watson's claims in light of precedent, the district court did not err by finding that Ramsey's behavior did not rise to the level of actionable hostile work environment sexual harassment. Thus, we agree with the district court that the evidence presented by Watson fails to show that Ramsey's conduct affected a term, condition, or privilege of her employment.[4] Thus, Heartland is entitled to judgment as a matter of law on Watson's hostile work-environment claim. Further, there are no disputes of material fact because we have considered the facts in the light most favorable to Watson.

## B. *Constructive Discharge*

Next, Watson argues that the district court erred in granting summary judgment in favor of Heartland on her constructive-discharge claim. In order to succeed on a constructive-discharge claim under the MHRA, Watson must prove the following elements: "1) a reasonable person in the employee's situation would find the working conditions intolerable, and 2) the employer intended to force the employee to quit, or the employer could reasonably foresee that its actions would cause the employee to quit." *DeWalt v. Davidson Serv./Air, Inc.*, 398 S.W.3d 491, 501 (Mo. Ct. App. 2013) (citing *Gamber v. Mo. Dep't of Health & Senior Servs.*, 225 S.W.3d 470, 477 (Mo. Ct. App. 2007)). Missouri courts take the following standards into account when deciding if these elements are met:

---

[4]Accordingly, we need not address the district court's alternative ruling that Heartland did in fact take prompt and effective remedial action to stop the alleged harassment. *See Hill*, 277 S.W.3d at 666 n.6.

-11-

> A claim of constructive discharge requires aggravating factors or a continuous pattern of discriminatory treatment. [*Gamber*, 225 S.W.3d at 477]. Evidence of a single instance is insufficient. *Id.* Reasonableness requires an employee not to assume the worst, and not to jump to conclusions too quickly. *Id.* No constructive discharge occurs where an employee quits without giving the employer a reasonable chance to resolve the problem. *Id.*

*Id.*

We conclude that a reasonable person would not find Watson's work environment "intolerable." As noted above, Watson was subject to one unwanted instance of physical touching and several verbal assaults by Ramsey, a patient at Plaza Manor, a client of her employer. Ramsey's actions lasted for brief portions of some eight-hour workdays over the course of ten days. While Watson testified as to her subjective belief that Heartland was not doing anything to remedy the situation, the undisputed facts belie that assertion. After the first reported incident, Heartland addressed the matter by removing Ramsey from her list of patients from which to draw blood. Watson argues that Heartland could have transferred her to another route immediately but that Akers told her that she would not get a transfer. Not receiving her preferred remedy, however, did not force her departure ten days later. To Watson's credit, we recognize that a reasonable waiting period is inversely related to the severity of situation. *Compare*, *DeWalt*, 398 S.W.3d at 501 (giving the employer "two weeks to resolve the problem" considering the seriousness of the employer asking the employee to violate his medical restrictions at work was reasonable), *with Gamber*, 255 S.W.3d at 479 (giving the employer "six weeks to correct the situation" was not reasonable). Given the nature of alleged conduct in this case, however, Watson was not reasonable in voluntarily abandoning her job after giving her employer only ten working days to remedy the perceived intolerability. On this record, we conclude Heartland is entitled to judgment as a matter of law as to Watson's constructive-discharge claim.

## C. *Retaliation*

Finally, Watson argues that Heartland retaliated against her for reporting Ramsey's conduct. The MHRA makes it unlawful for an employer "[t]o retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter or because such person has filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing conducted pursuant to this chapter." Mo. Ann. Stat. § 213.070(2). To succeed on a claim of retaliation under the MHRA, Watson must prove that "(1) [s]he complained of discrimination; (2) [Heartland] took adverse action against [her]; and (3) a causal relationship existed between the complaint and the adverse action." *McCrainey v. Kan. City Mo. Sch. Dist.*, 337 S.W.3d 746, 753 (Mo. Ct. App. 2011) (citing *Cooper*, 204 S.W.3d at 245). We have already concluded that Watson was not constructively discharged; thus, her argument that such discharge was an "adverse action" fails. We will consider whether the two verbal warnings and extension of her probationary period constitute retaliations under the MHRA.[5]

In order to prove the second element of retaliation, the "adverse action" must "result[] in damage to the plaintiff." *Keeney v. Hereford Concrete Prods., Inc.*, 911 S.W.2d 622, 625 (Mo. 1995) (en banc). Heartland argues that this requirement of an adverse action defeats Watson's retaliation claim—which is based on the write-ups and extension of her probationary period—because she was not adversely affected at all by these actions. Heartland did not reduce Watson's pay, lower her work hours,

---

[5]Watson also alleges that Gaunt issued a disciplinary write-up for failing to draw Ramsey's roommate's blood. Watson provides no proof, however, that this write-up exists. She has never seen this write-up and was never asked to sign it. We do not consider mere speculation on summary judgment, but only facts that are supported by evidence. *See Hamilton v. Bangs, McCullen, Butler, Foye & Simmons, L.L.P.*, 687 F.3d 1045, 1050 (8th Cir. 2012) ("To survive a motion for summary judgment, [a plaintiff] must present more than unsupported conclusions and speculative statements, which do not raise a genuine issue of fact." (quotation omitted) (alteration in original)).

and did not change her job duties. Watson's evidence does not establish even nominal damage based on Heartland's disciplinary actions

Further, Watson has failed to show evidence supporting the third element of her retaliation claim: that the alleged adverse actions have a causal relationship with her complaints of Ramsey's harassment. Watson's strongest argument is that the adverse actions "followed the protected activity so closely in time as to justify an inference of retaliatory motive." *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (quotation and citation omitted). Watson received two verbal warnings on September 13 and 18, 2012, just days after her complaints of Ramsey's physical touching and initial verbal harassments. Similarly, Watson was notified on September 18, 2012, that her 90-day probationary period would have to be extended because she failed to work the standard 40 hours per week for the 90-day period. First, "[m]ore than a temporal connection between an employee's protected conduct and the adverse employment action is required to create a genuine factual issue on causation." *Hesse*, 394 F.3d at 633; *see also Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 716 (8th Cir. 2000). Second, Watson presents no evidence that her reporting of Ramsey's harassment was a contributing factor to the verbal warnings and extension of her probationary period. Rather, the record shows that Watson had received two previous verbal warnings in August 2012 for legitimate reasons. Watson even admitted that the verbal warning on September 13, 2012, was legitimate. Watson also admitted that she "didn't have a problem with extending the [probationary] period" because she "needed more time . . . to be consistent and things like that." Thus, Watson's allegation that her reports of Ramsey's harassment produced the adverse actions are speculative.

Watson finally argues that the actions and words of Akers and Gaunt showed "hostility, and retaliatory animus." *See Jackson v. City of Hot Springs*, 751 F.3d 855, 862 (8th Cir. 2014) (considering an FMLA retaliation claim, stating that "[e]vidence that gives rise to an inference of a retaliatory motive on the part of the employer is sufficient to establish a causal link" (quotation and citations omitted)). We do not

-14-

believe a reasonable jury could draw this inference from the facts presented. Watson's claim for retaliation fails as a matter of law.

### III. *Conclusion*

For the reasons stated herein, we affirm.

_____